UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| STONEEAGLE SERVICES, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 3:14-cv-3120-M |
| | § | |
| TALON TRANSACTION | § | |
| TECHNOLOGIES, INC., a Texas | § | |
| Corporation, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO ALLEGE
INFRINGEMENT OF A PATENTABLE CLAIM WITH BRIEF IN SUPPORT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... iii

INTRODUCTION ................................................................................................................... 1

I.   REQUEST FOR ORAL ARGUMENT ......................................................................... 1

II.  FACTUAL AND PROCEDURAL BACKGROUND..................................................... 1

III. STANDARD OF REVIEW ........................................................................................... 7

IV.  ARGUMENT ................................................................................................................. 8

    A.   The '904 Patent Is Invalid as a Matter of Law Under § 101................................. 8

        1.   The '904 Patent is directed to the well-known and abstract idea of remitting payments and EOBs concurrently to health care providers to satisfy health insurance claims .......................... 9

        2.   The '904 Patent does not add an inventive concept by computerizing only portions of the traditional process for paying health insurance claims ................................................................ 13

    B.   StoneEagle Failed to Include Sufficient Allegations to Support a Claim of Indirect Infringement .......................................................................... 21

        1.   Without allegations showing that Defendants' products have no substantial non-infringing uses, StoneEagle cannot state a claim for contributory infringement ............................................ 21

        2.   StoneEagle fails to state a claim for induced infringement under *Limelight* ....................................................................................... 22

CONCLUSION ...................................................................................................................... 24

CERTIFICATE OF SERVICE ............................................................................................... 25

# TABLE OF AUTHORITIES

*Alice Corporation Pty. Ltd. v. CLS Bank International*, 134 S. Ct. 2347 (2014) ................................................................................................*passim*

*Bancorp Servs., LLC v. Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266 (Fed. Cir. 2012) ........................................................................ 7, 23

*Bilski v. Kappos*, 561 U.S. 593, 130 S. Ct. 3218 (2010) ......................................*passim*

*buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350 (Fed. Cir. 2014) ..........................*passim*

*Gonzales v. Kay*, 577 F.3d 600 (5th Cir. 2009) ................................................... 7, 21

*In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323 (Fed. Cir. 2012) ...................................................................... 7, 20, 21

*Limelight Networks, Inc. v. Akamai Techs., Inc.*, ___ U.S. ___, 134 S. Ct. 2111 (2014) ............................................................................... 6–7, 21–22

*Loyalty Conversion Sys. Corp. v. Am. Airlines, Inc.*, No. 13-cv-655, 2014 WL 4364848 (E.D. Tex. Sept. 3, 2014) .................................................. 7, 11, 14–15

*McZeal v. Sprint Nextel Corp.*, 501 F.3d 1354 (Fed. Cir. 2007) ................................. 6

*Open Text S.A. v. Alfresco Software Ltd.*, No. 13-CV-04843, 2014 WL 4684429 (N.D. Cal. Sept. 19, 2014) ............................................... 7, 11, 14

*Reliable Consultants v. Earle*, 517 F.3d 738 (5th Cir. 2008) ..................................... 6

*Tuxis Techs., LLC v. Amazon.com. Inc.*, No. 13-cv-1771, 2014 WL 4382446 (D. Del. Sept. 3, 2014) ......................................................................... 14, 16

*Ventana Med. Sys. v. Biogenex Labs, Inc.*, 73 F.3d 1173 (Fed. Cir. 2006) ................ 17

### *Statutes & Regulations*

35 U.S.C. § 101 ........................................................................................*passim*

35 U.S.C. § 271(c) ............................................................................................ 20

FED. R. CIV. P. 12(b)(6) ................................................................................. 6, 21

## INTRODUCTION

Plaintiff StoneEagle Services, Inc.'s patent infringement claims should all be dismissed because the patent at issue—U.S. Patent No. US RE43,904 E ("the '904 Patent")—is invalid as a matter of law. The '904 Patent teaches a method for accomplishing something that has been done in the health insurance industry since the advent of the industry: a method for paying health care providers and delivering explanations of benefits ("EOBs") to settle health insurance claims. The only "novel" element the '904 Patent adds to this well-known and well-established process is the use of standard computer functions, which increase the speed of the traditional payment process while reducing its costs. But under the logic of recent decisions on patentability under 35 U.S.C. § 101, including *Alice Corporation Pty. Ltd. v. CLS Bank International*, __ U.S. __, 134 S. Ct. 2347 (2014), adding a computer to a well-known process that may be—and has long been—accomplished without computers is no longer sufficient to render an idea patentable. Indeed, it is precisely this "do-it-with-a-computer" feature of the '904 Patent that makes it invalid. What is more, even if the '904 Patent were valid, StoneEagle's claims for induced and contributory infringement would fail because StoneEagle has failed to plead sufficient facts to state an indirect infringement claim, whether for contributory or induced infringement.

## I. REQUEST FOR ORAL ARGUMENT

Given the novelty of the issues presented in both portions of this motion, Defendants request oral argument. A lawyer who has been practicing seven years or less will argue the motion for Defendants.

## II. FACTUAL AND PROCEDURAL BACKGROUND

The '904 Patent was issued on January 1, 2013, as a reexamination of U.S. Patent No. 7,792,686. The ''904 Patent claims a "method of facilitating payment of health care benefits to

on [sic] behalf of a payer comprising the step of electronically transmitting a stored-value card account payment of the authorized benefit amount concurrently with an explanation of benefits."[1]

As the '904 Patent acknowledges on its face, for as long as health insurance has existed, the payment of health insurance claims has consisted of the following general steps: (1) an insured patient consumes services from a health care provider; (2) a health care provider submits a benefit claim to a payer of claims (e.g., a third party administrator, insurance company, government agency etc.); (3) the payer evaluates and adjudicates the benefit claim to determine whether all or part of the claim is payable under the terms of the insured patient's health plan; (4) the payer of claims funds an account in anticipation of the benefits claim; (5) money is drawn from the account if the claim is paid; (6) the payer generates an explanation of benefits and a payment for the health care provider (e.g., a check); (7) "the explanation of benefits and check are then *sent concurrently* to [the] health care provider," such as by mail; and (8) the reconciliation of the negotiated payment with the payer's account to ensure the health care provider received the payment.[2] But, as the '904 Patent also acknowledges, there are drawbacks to this "prior art," namely "the cost and time associated with generating hardcopy checks and sending them *by mail* to health care provider."[3] StoneEagle's solution to these drawbacks, as outlined in the '904 Patent, is simple: use a computer to "streamline" the well-known process outlined above and make it more cost-effective.[4]

With this solution in mind, the '904 Patent takes a well-known, routine business transaction (payment of an adjudicated claim and transmission of an EOB) and breaks it down

---

[1] Defs.' App. in Support of Their Mot. to Dismiss, Docket Entry No. 7, Ex. 1, US Patent No. US RE43,904 E, col. 3:8–26 (emphasis added) (hereafter " '904 Patent, col. __").
[2] '904 Patent col. 3:8–26 (emphasis added).
[3] *Id*. col. 3:27–29 (emphasis added).
[4] Id. col. 1:19–20.

into small, constituent steps, some of which are performed by a computer. Each claim in the '904 Patent presumes the occurrence of the first three steps outlined above (e.g., patient's consumption of services, and the filing and adjudication of a benefits claim).[5] However, instead of transmitting the EOB and check concurrently to the health care provider by mail, as is typically done,[6] the claimed "invention includes the step of *electronically transmitting* a stored-value card account payment of the authorized benefit amount concurrently with an explanation of benefits."[7] In other words, the claimed invention sends the benefit payment and the EOB concurrently as in the traditional claims payment process, but uses a computer instead of the mail.

Figure 3 of the '904 Patent shows that the same entities involved in paying adjudicated health care claims by a mailed check are also involved in method claimed in the patent:



As shown, the method claimed in the '904 Patent begins with the insured consuming services (20) just like the traditional method. The steps that follow are also the largely the same: the

---

[5] See, for example, Claim 1, which provides for "[a] method of facilitating payment of *adjudicated health care benefits* to a health care provider on behalf of a payer[.]" *Id*. at col. 4:11–12 (emphasis added).

[6] *Id*. col. 3:8–26 (emphasis added) (hereafter " '904 Patent, col. __").

[7] *Id*. col. 1:51–54.

adjudication of the claim by the Administrator (40), the setting aside of funds for payment of the claim (70), the generation of an EOB, and the concurrent remittance of the EOB with the payment.[8] The only difference between the "prior art" and the claimed invention is the means of payment ("stored value card" versus a check), and the electronic transmission of the payment and EOB instead of their mailing.[9] The merging of the EOB and payment is merely a computerized means of duplicating the traditional process of mailing the EOB and check "concurrently to [the] health care provider."[10]

While computers are central to performing the '904 Patent's method and system claims, the patent does not impose or teach any unique features for these computers or improve their functionality. On the contrary, the patent expressly takes the computers as they are found, i.e., as they are "known in the art."[11] Any details regarding these computers are left to the reader's imagination.

The patent's use of computer networks is no different. The method taught in the '904 Patent may be executed with general-purpose computers using standard Internet protocols such as SMTP (Simple Mail Transfer Protocol or "email"), SMS (Short Message Service or "texting"), MMS (Multimedia Messaging Service, another form of texting), HTTP (HyperText Transfer Protocol, or the web), HTTPS (a secure version of HTTP), and FTP (File Transfer Protocol).[12] There are no special network requirements described anywhere in the specification or claims.

---

[8] *Compare id*. col. 3:8–26 & Fig. 1 (explaining the "prior art"), *with* id. col. 3:47–62 & Fig. 3 (explaining an embodiment of the claimed invention).
[9] *Id*. col. 3:47–62.
[10] *See id*. col. 3:25–27.
[11] See id. col. 2:25–27, 48–49.
[12] *See, e.g.*, *id*. col. 2:11–17.

Moreover, the '904 Patent does not claim to have invented EOBs, stored-value cards or stored-value card accounts, or any of the means of electronically transmitting the payment or EOB (e.g., HTTP, SMS, SMTP), or the "medical services terminal" that may be used to process payments. The '904 Patent merely takes these existing technologies as they are and applies them to the claimed method for paying benefit claims.

Each method appearing in the claims reflects the do-it-with-a-computer approach expressed in the '904 Patent's terse specification. Claim 1, for example, claims "[a] method of facilitating payment of adjudicated health care benefits to a health care provider on behalf of a payer," and requires that each of the following steps be performed:

> loading a unique, single-use, stored-value card account with an amount equal to a single, authorized benefit payment, the card account only chargeable through a medical services terminal;

> generating an explanation of benefits associated with the payment;

> creating a computer-generated image file containing the stored-value card account number, the amount, a card verification value code, an expiration date, and the explanation of benefits;

> transmitting the image file by fax to the health care provider; and

> reconciling the charged card account to confirm that the health care provider has received payment.[13]

As noted above, the only indication that a computer is used at all in Claim 1 is the modifier "computer-generated" before the term "image file." Beyond that, a person may perform *all* of the steps in Claim 1 either as mental steps or as manual steps (i.e., operating a fax machine).

The remaining independent claims (Claims 2, 6, 7, 12, 17, and 22) adopt the same basic approach to paying health care benefits as Claim 1. Each of these other independent claims teaches a method or system of paying already adjudicated health care benefits claims, while

---

[13] *Id.* col. 4:11–27.

teaching nothing about the adjudication of claims.[14] Furthermore, as with Claim 1, each of these other independent claims uses a general computer, and common computer network configurations, to create and transmit payments concurrently with EOBs and to reconcile payments with the accounts on which those payments are drawn.

Although additional steps in the payment process are added to some of these claims, in all cases these additional steps are merely constituent and inherent steps that have long been performed when paying an adjudicated health care benefit in the industry. Claim 2, for instance, adds the steps of "identifying the health care provider" and "identifying an administrator that determines whether the medical services conducted by the service provider meet the preselected conditions by the payer, generates an explanation of benefits, and authorizes payment of the service provider for an authorized amount[.]"[15] These are steps already present in the "prior art."[16] Claim 22 also provides a "system for payment of adjudicated health care benefits to a health care provider," while requiring the system do what every system for paying adjudicated health care benefits must do, computerized or not: "to receive a benefit claim . . . and to generate an explanation of benefits . . . along with an approved payment[.]"[17] Claim 22 then invokes the use of "one or more computers" to accomplish the task of remitting the payment and EOB, but only to process a single-use stored-value card account and transmit the payment concurrently with an EOB to the provider.[18] There is no mention of any special processes or networks used in Claim 22.

After the United States Supreme Court issued decisions in *Alice* and *Limelight Networks, Inc. v. Akamai Techs., Inc.*, __ U.S. __, 134 S. Ct. 2111 (2014), StoneEagle sued Defendants for

---

[14] *Id.* col. 4–col. 6.
[15] *See, e.g., id.* col. 4:36–39.
[16] *Id.* col. 3:8–26 & Fig. 1.
[17] *Id.* col. 6:40–42.
[18] *Id.* col. 6:43–50.

infringing the '904 Patent both directly and indirectly.[19] Defendants then waived service and now file this motion to dismiss because the StoneEagle's patent claims fail to state a claim upon which relief can be granted. Either the '904 Patent is invalid as a matter of law, or StoneEagle's allegations fail to support a claim for indirect infringement.

### III. STANDARD OF REVIEW

Fifth Circuit law provides the standard for Rule 12(b)(6) motions. *See McZeal v. Sprint Nextel Corp.*, 501 F.3d 1354, 1355–56 (Fed. Cir. 2007). To survive a Rule 12(b)(6) motion to dismiss, "the plaintiff must plead enough facts to state a claim to relief that is plausible on its face." *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 742 (5th Cir. 2008) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Gonzales v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009) (internal quotation marks omitted). Within the context of patent law, a complaint for direct infringement that complies with Form 18 states a plausible claim for relief. *See, e.g.*, *In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1338 (Fed. Cir. 2012). But Form 18 provides a sample pleading for direct infringement claims only. *Id.* at 1336–37. Claims for *indirect* infringement must therefore satisfy federal plausibility standards. *Id.*

Patent eligibility under 35 U.S.C. § 101 is a question of law that may be decided on a motion to dismiss or for judgment on the pleadings without any construction of the claims. *See, e.g.*, *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1353 (Fed. Cir. 2014) (affirming district court's entry of judgment on the pleadings where patent at issue was invalid as a matter of law); *Open Text S.A. v. Alfresco Software Ltd.*, No. 13-CV-04843, 2014 WL 4684429, at *3 (N.D. Cal. Sept. 19, 2014) (collecting cases); *Loyalty Conversion Sys. Corp. v. Am. Airlines, Inc.*, No. 13-

---

[19] Pl.'s Orig. Compl., Docket Entry No. 1, at 12–13.

cv-655, 2014 WL 4364848, at *4 (E.D. Tex. Sept. 3, 2014); *see also Bancorp Servs.*, *LLC v. Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266, 1273 (Fed. Cir. 2012) ("[C]laim construction is not an inviolable prerequisite to a validity determination under § 101.").

## IV. ARGUMENT

There are two reasons to grant Defendants' motion to dismiss. As a threshold matter, the '904 Patent involves nothing more than a computerized abstract idea and therefore falls outside § 101. *See*, *e.g.*, *buySAFE, Inc. v. Google, Inc.*, 765 F.3d at 1353–55. Alternatively, StoneEagle's claims for contributory and induced infringement should be dismissed for failure to state a claim because StoneEagle's complaint lacks any plausible facts to support such claims. *See, e.g.*, *Limelight Networks*, 134 S. Ct. at 2120 (induced infringement); *In re Bill of Lading*, 681 F.3d at 1337 (contributory infringement).

## A.    The '904 Patent Is Invalid as a Matter of Law Under § 101.

Because the '904 Patent teaches nothing more than a computerized abstract idea, the patent is invalid as a matter of law. Under § 101, only one who "invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor . . . ." 35 U.S.C. § 101. Abstract ideas fall outside § 101's scope and therefore are not patentable. *buySAFE*, 765 F.3d at 1352. The exclusion of abstract ideas from patentable subject matter is vital to ensure that patent law does "not inhibit further discovery by improperly tying up the future use of these building blocks of human ingenuity." *Id.* (internal quotation marks omitted).

Courts apply a two-part test to determine whether a patent falls outside the eligibility bounds of § 101. *Id.* at 1353. Courts first determine whether the patent's claims are directed to an

abstract idea.[20] *Id*. If so, courts then examine whether the patent's claims "supply an 'inventive concept' in the physical realm of things and acts—a 'new and useful application' of the ineligible matter in the physical realm—that ensures that the patent is on something 'significantly more than' the ineligible matter itself." *Id*. (quoting *Alice*, 134 S. Ct. at 2355, 2357). Here, each claim in the '904 Patent is invalid under § 101 because each claim is directed to an abstract idea that fails to supply an inventive concept.

All that StoneEagle claims in the '904 Patent is a well-known abstract idea for paying health care providers who file insurance claims after an "insured patient 20 consumes services from health care provider 30," and after an administrator adjudicates those claims.[21] The claims add no inventive concept to that routine process. All that these method claims add is a generic computer and, in some claims, the use of an equally generic computer network.[22] The Court should therefore grant Defendants' motion, hold that StoneEagle's patent is invalid as a matter of law, and dismiss all of StoneEagle's patent claims from this action.

1.    **The '904 Patent is directed to the well-known and abstract idea of remitting payments and EOBs concurrently to health care providers to satisfy health insurance claims.**

It is well established that "an idea of itself is not patentable." *Alice*, 134 S. Ct. at 2355. Accordingly, patents that are "directed to" abstract ideas are invalid. *buySAFE*, 765 F.3d at 1353. Here, the logic of a number of recent cases, coupled with a plain reading of the '904 Patent's claims, shows that such claims are all directed to an abstract idea: remitting payments and EOBs concurrently to health care providers to satisfy health insurance claims made against a health plan.

---

[20] There are two other inapplicable exceptions to § 101: laws of nature and natural phenomena. *buySAFE*, 765 F.3d at 1352.
[21] '904 Patent col. 3:8–26.
[22] *See, e.g.*, *id*. col. 4:11–27.

Although there is no precise test for determining whether a patent is directed to an abstract idea, a number of recent cases provide concrete guidance, and show why the '904 Patent is directed to an abstract idea. In *Bilski v. Kappos,* 561 U.S. 593, 130 S. Ct. 3218 (2010), for example, the patent at issue concerned a method to hedge risk in commodities markets. *Id*. at 599. The Court held, however, that the patent was directed to an abstract idea because hedging was "a fundamental economic practice long prevalent in our system of commerce and taught in any introductory finance class," and that the claims in the patent merely explained the basic concept of hedging and protecting against risk. 561 U.S. at 611 (internal quotation marks omitted).

In *Alice*, the Court extended its holding in *Bilski*, and invalidated a patent disclosing a method for mitigating settlement risk through use of a computer because, the Court found, the patent was directed to an abstract idea. 134 S. Ct. at 2356. The patent at issue in *Alice* claimed a method for exchanging financial obligations between two parties through a third-party intermediary (a computer) that mitigated settlement risk. *Id*. The mitigation of risk occurred because the intermediary created and updated "shadow" records reflecting the value of each party's accounts, which thus allowed the intermediary to ensure each side could fulfill their obligations. *Id*. If sufficient resources existed, the intermediary issued instructions to each parties' "exchange institution" to execute the proposed transaction. *Id*. The Court held that these claims were invalid *on their face* because the method for settlement taught in the patent was "a fundamental economic practice long prevalent in our system of commerce," and a "building block of the modern economy." *Id*.

More recently, the Federal Circuit applied *Bilski* and *Alice* to affirm a district court's order invalidating a patent under § 101 (on a Rule 12(c) motion) because the method taught in the patent at issue was merely an abstract idea. *See buySAFE*, 765 F.3d at 1354. The plaintiff's

patent in *buySAFE* recited a method for guaranteeing performance of online transactions. *Id*. at 1351. The method at issue used a computer to receive a request for a performance guarantee of an online commercial transaction, to process the request, and to offer, via a "computer network," a transaction guaranty that became binding upon the closing of the transaction. *Id*. Examining the claims, the district court invalidated the plaintiff's patent because the patent merely described "a well-known, and widely understood concept—a third-party guarantee of a sales transaction—and then applied that concept using conventional computer technology and the Internet." *Id*. at 1352 (internal quotation marks omitted). The Federal Circuit approved the district court's reasoning, and affirmed the invalidation of the patent: "The claims are squarely about creating a contractual relationship—a 'transaction performance guaranty'—that is beyond question of ancient lineage." *Id*. at 1355. This was so, the court held, even though some of the patent's dependent claims narrowed the claims to particular types of relationships (e.g., a surety bond or specialized bank guaranty). "This kind of narrowing of such long-familiar commercial transactions does not make the idea non-abstract for section 101 purposes." 765 F.3d at 1355; *see also Open Text*, 2014 WL 4684429, at *4 (holding that method of identifying potential or current customers and engaging them to determine how to improve their experience with a merchant was directed to an abstract idea); *Loyalty Conversion Sys.*, 2014 WL 4364848, at *6–7 (E.D. Tex. Sept. 3, 2014) (holding that method for converting points gained in one vendor's loyalty program (e.g., frequent-flyer miles) into points that can be used to purchase goods or services from another vendor was directed to an abstract idea).

Under the logic of these recent decisions, each of the '904 Patent's claims, including its independent claims (Claims 1, 2, 6, 7, 12, 17, and 22), is directed to an abstract idea.[23] Like the

---

[23] If all independent claims are directed at an abstract idea, then *a fortiori* the dependent claims (Claims 3–5, 8–11, 13–16, 18–21, and 23–26) are directed at an abstract idea.

methods taught by the patents at issue in *Alice*, *buySAFE*, and the other cases cited above, the claims in the '904 Patent merely recite a well-known and widely understood concept: the method for paying an adjudicated health care benefit concurrent with the transmission of an EOB to satisfy a health insurance claim. Indeed, in outlining the non-computerized "prior art" for accomplishing this bedrock process of the healthcare industry,[24] and explaining the invention's purpose,[25] the '904 Patent acknowledges this fact on its face.

Claim 1, for example, outlines a method for "facilitating payment of adjudicated health care benefits to a health care provider on behalf of a payer."[26] But, as noted in Figure 1, facilitating payment of adjudicated health care benefits, while transmitting an EOB, is a common commercial transaction that long predates the application on which the '904 Patent is based. The steps of Claim 1 include nothing more than constituent and inherent steps noted in Figure 1: funding an account with money for payment of an adjudicated health care benefit; drawing money from the account to pay the health care claim; generating an EOB; concurrently transmitting the payment and the EOB to the health care provider; and reconciling the account on which the payment is drawn.[27] Claim 1 is directed to an abstract concept.

So is Claim 2. Like Claim 1, Claim 2 is directed to a "method of facilitating payment of adjudicated health care benefits to a health care provider."[28] Like Claim 1, the steps of Claim 2 include nothing more than constituent and inherent steps associated with paying a health care claim. The only difference is that Claim 2 attempts to break the claims payment process down into smaller steps than Claim 1. While these steps may narrow Claim 2 in some sense, that fact

---

[24] '904 Patent col. 3:8–26.
[25] *Id*. col. 2:18–20, 48–51.
[26] '904 Patent col. 4:11–12.
[27] *Compare id*. col. 3:8–26 (outlining the "prior art" for paying health insurance claims), *with* id. col. 4:11–27 (outlining steps of Claim 1).
[28] *Id*. col. 4:28–30.

does not, without more, change the analysis under § 101 or make Claim 2 non-abstract. *See, e.g.,* *buySAFE*, 765 F.3d at 1355 (citing *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1303 (2012)).

Although Defendants could parse out each of the remaining independent claims in the '904 Patent (Claim 6, 7, 12, 17, and 22), a step-by-step analysis of each claim is unnecessary. At their core, each of these method or system claims is expressly directed to the "payment of adjudicated health care benefits to a health care provider on behalf of a payer" concurrent with the transmission of an EOB,[29] and other process inherent in that routine transaction (such as reconciliation of such payments against the account on which they are drawn).[30] This is nothing more than an abstract idea. Accordingly, unless these claims add an "inventive concept" they are invalid under § 101.

2.    **The '904 Patent does not add an inventive concept by computerizing only portions of the traditional process for paying health insurance claims.**

Even though the '904 Patent uses a computer to accomplish some of the steps in the method or system described in each claim, the '904 Patent is invalid because its method claims lack any inventive concept. Merely because an abstract idea is implemented in some specific fashion does not mean that said implementation "will automatically fal[l] within the patentable subject matter of § 101." *Alice*, 134 S. Ct. at 2358 (internal quotation marks omitted). To be patentable, a claim reciting an abstract idea "must include 'additional features' to ensure 'that the [claim] is more than a drafting effort designed to monopolize the [abstract idea].'" *Alice*, 134 S. Ct. at 2357 (internal quotation marks omitted).

While there are clear tests for determining when additional features will render a claim directed to an abstract idea patentable, one thing is clear: "a claim directed to an abstract idea

---

[29] *Id.* col. 4:61–col. 5:27 (Claims 6–7), col. 5:41–58 (Claim 12), col. 6:8–24 (Claim 17), col. 6:37–51 (Claim 22).
[30] *See, e.g., id.* col. 4:26–27, 55–56, 5:13–14.

does not move into section 101 eligibility territory by merely requir[ing] generic computer implementation." *buySAFE*, 765 F.3d at 1354 (internal quotation marks omitted). Nor will limiting the use of an abstract idea "to a particular technological environment." *Id*. (internal quotation marks omitted). Otherwise, "an applicant could claim any principle of the physical or social sciences by reciting a computer system configured to implement the relevant concept," and thus eviscerate § 101's limitation on patenting abstract ideas. *Alice*, 134 S. Ct. at 2359.

Applying these principles in *Alice*, the Court held that although the method claims at issue required substantial and meaningful use of a computer, that fact, without more, was not sufficient to make the patent's subject matter patentable under § 101. *Id*. at 2359–60. The claim steps required the computer to keep electronic records, obtain data, adjust account balances, and issue automated instructions. *Id*. at 2359. But this was not enough to make the claims patentable under § 101. Each step required merely a generic computer to perform generic computer functions. *Id*. at 2359. Moreover, while the patentee's system claims contained specific references to hardware necessary to perform these specific computer functions (e.g., "data processing system," "communications controller"), the Court held that these references failed to make the system claims patentable. The components referred to in the claims were functional and generic computer components that nearly every computer included. *Id*. at 2360.

Under the logic of *Alice*, many courts have recently made short work of computerized abstract ideas like those in the '904 Patent. *See buySAFE,* 765 F.3d at 1355 (holding that the mere fact that the method claims used a computer and a network connection to receive a request for a guarantee and to transmit an offer of guarantee in return, without any further detail, was "not even arguably inventive"); *Open Text*, 2014 WL 4684429, at *4 (invalidating computerized method claims as abstract ideas where the claims' use of a computer was generic and lacked any

meaningful limitations); *Tuxis Techs., LLC v. Amazon.com, Inc.*, No. 13-cv-1771, 2014 WL 4382446, at *3–5 (D. Del. Sept. 3, 2014) (holding that a computerized method for upselling to a customer was not patentable in part because a human being could generate an upsell recommendation during the course of a transaction, though not with the same speed and efficiency of a computer); *Loyalty Conversion Sys.*, 2014 WL 4364848, at *6–7 (holding that computerized method claim for exchanging loyalty awards was invalid where patentee did not claim to have invented the concept of converting loyalty awards, but merely claimed to have invented a computerized method and system for performing that task more efficiently).

In fact, a pattern has emerged from these recent § 101 decisions that help identify patentable claims from abstract ones. As the court noted in *Loyalty Conversion*, these cases (among others) make clear that "although frequently dressed up in the argot of invention," abstract idea patents are those that "simply describe a problem, announce purely functional steps that purport to solve the problem, and recite standard computer operations to perform some of those steps." 2014 WL 4364848, at *13. The '904 Patent fits that mold perfectly.

The '904 Patent describes a problem: "[d]rawbacks associated the prior art include the cost and time associated with generating hardcopy checks and sending them by mail to health care provider [sic]."[31] The '904 Patent then proceeds to describe purely functional steps in each claim that purport to solve the identified problem, and includes standard computer operations to perform some of those steps. An examination of the independent claims (Claims 1, 2, 6, 7, 12, 17, and 22) shows this to be true.

Claim 1 recites a method for "facilitating payment of adjudicated health care benefits to a health care provider." The steps for this method include "loading a unique, single-use, stored-

---

[31] '904 Patent col. 3:26–29.

value card account with an amount equal to a single, authorized benefit payment."[32] The '904

Patent does not purport to have invented such cards or card accounts. *Cf. Loyalty Conversion*

*Sys.*, 2014 WL 4364848, at *6–7. As StoneEagle's complaint acknowledges, single use, stored

value cards were a well-known form of payment even before the filing of the application on

which the '904 Patent is based.[33] The claims merely use an existing technology in a generic way

(i.e. its most natural and intended use). *Cf. Alice*, 134 S. Ct. at 2359–60. Claim 1 further recites

that the card account is "only chargeable through a medical services terminal," which is a

terminal that may be coupled to a "computer-implemented communications network" as is used

for credit and debit card transactions[34]—another well established process at the time of the

invention.

Moreover, while Claim 1 also recites a "computer-generated" image file, the claim never

describes what type of computer generates this image. By all accounts, any "general purpose

computer" can generate this image file. But, as in *Alice* and *buySAFE*, using a general-purpose

computer to create and transmit records is not inventive, as that is "one of the most basic

functions of a computer." *Alice*, 134 S. Ct. at 2359.

The same is true of Claim 1's final steps of "transmitting the image file by fax to the

health care provider," and "reconciling the charged card account to confirm that the health care

provider received payment."[35] Using a fax machine for its intended purpose—transmitting

printed information—hardly qualifies as an inventive concept under the logic of *Alice* and

*buySAFE*. And payment reconciliation has been a business practice since time immemorial.

These additional steps consist of nothing more than "well-understood, routine, conventional

---

[32] '904 Patent col. 4:11–13.
[33] Pl.'s Orig. Compl. ¶ 9 (noting StoneEagle's use of stored-value cards to make payments in a different industry as early as 2002).
[34] '904 Patent col. 2:24–27.
[35] *Id.* col. 4:24–27.

activity previously known to the industry," and are therefore not patentable. 134 S. Ct. at 2359 (internal quotation marks omitted).

Like Claim 1, the other independent claims do not limit the abstract idea in any meaningful way. The first three steps of Claim 2, for example, have been essential steps to paying *every* adjudicated health care benefit since the institution of health insurance. No one can pay a health care benefit unless the health care provider and the payer are first identified (the first two steps of Claim 2), and an administrator determines whether the medical services conducted meet preselected conditions, generates an EOB, and authorizes payment of the service provider (step three).[36] The additional steps outlined in Claim 2 are merely a computer-driven series of steps designed to facilitate a commonplace transaction that could be accomplished by manual means (though perhaps not as effectively or efficiently). *Cf. Tuxis Techs.* 2014 WL 4382446, at *5. Furthermore, Claim 2's limitation of "acquiring a single-use, stored-value card account number and loading it with funds equal to the authorized amount" is also an utterly conventional and inherent step that is part of the abstract idea of adjudicating and paying health care benefits using a virtual payment card—a payment medium StoneEagle does not claim to have invented and that preceded the patent by many years.

The limitation of "merging" payment information (e.g., the stored-value card account number, the authorized amount, a card verification value code, expiration date etc.) with an EOB into "a computer-generated image file" appears in Claim 2, and several other claims. But this limitation should not alter the conclusion that the '904 Patent's claims are ineligible under § 101.[37] For starters, as the specification itself acknowledges, the merging of the EOB and payment is merely a computerized duplication of the traditional process of mailing the EOB and

---

[36] '904 Patent col. 4:30–38.
[37] *Id*. col. 4:46–49; *see also* id. col. 5:48–52 (Claim 12); *id*. col. 6:18–22 (Claim 17); *id*. col. 6:46–49 (Claim 22).

check "concurrently to [the] health care provider."[38] Indeed, one of the invention's preferred embodiments uses the language from the specification's discussion of the "prior art" to describe the process for sending EOBs and payments.[39] Moreover, the card account information and the EOB are both text data that may *or may not* include an electronically computer-generated image of a physical debit card.[40] *Cf. Ventana Med. Sys. v. Biogenex Labs., Inc.*, 73 F.3d 1173, 1181 (Fed. Cir. 2006) (holding that claims are not confined to disclosed embodiments only). In other words, the claims permit the use an ordinary computer process (combining or "merging" two forms of data) to perform functional steps that have routinely occurred in the industry, namely the concurrent transmission of an EOB and a payment to a health care provider along with other process inherent in that routine transaction (such as reconciliation of such payments against the account on which they are drawn).[41]

Claim 6 contains many of the same steps as Claim 1, but includes the additional limitations of "transmitting the image file by a computer-implemented electronic transmission medium selected from the group consisting of fax, SMTP, SMS, MMS, HTTP, HTTPS, and FTP to the health care provider wherein the electronic transmission includes a computer-generated image of a physical card."[42] But these additional steps are not inventive. This limitation merely includes a laundry list of well-known protocols for transmitting data (e.g., email, text messaging, the Internet). The claims make no effort to improve the functioning of these well-known

---

[38] *See id.* col. 3:25–27.

[39] *Compare id.* col. 1:51–54 ("An embodiment of the invention includes the step of electronically transmitting a stored-value card account payment of the authorized benefit amount *concurrently with an explanation of benefits*."), *with id.* col. 3:25–56 ("The explanation of benefits and check are then sent concurrently to health care provider [by mail] 30.").

[40] '904 Patent col. 2:14–17 ("The electronic transmission *may* include an electronically computer-generated image of a physical debit card and the unique debit card number is associated with a single benefit payment.")

[41] *See, e.g., id.* col. 3:25–26, 4:26–27, 55–56, 5:13–14.

[42] *Id.* col. 4:61–col. 5:14.

protocols. This limitation therefore fails to provide an inventive step to the abstract idea of payment of an adjudicated claim. *See, e.g.*, *Alice*, 134 S. Ct. at 2359–60.

Because Claim 7 recites most of the same limitations and features as Claim 1, Claim 7 fails to provide an inventive step to the abstract idea for the same reasons stated above with respect to Claim 1. Although Claim 7 further recites that the step of loading a unique, single-use stored-value card is performed by "one or more computers" and also recites that the step of transmitting the file is performed by "the one or more computers," this step is not inventive. This is merely the insufficient use of a "general purpose computer," and therefore does not inject any meaningful limitation to a claim that is otherwise directed to an abstract idea. *See buySAFE*, 765 F.3d at 1353.

Claim 12 is a system claim "for payment of adjudicated health care benefits combining payment terms and an explanation of benefits."[43] However, all of the limitations recited in Claim 12 are similar, or identical, to the limitations disclosed in Claims 1, 2, 6, or 7, and therefore fail to provide an inventive concept for the reasons stated above.

Claim 17 is directed to a "computer implemented method for combining payment of adjudicated health care benefits with an associated explanation of benefits."[44]  However, the Claim 17 steps of  "receiving an explanation of benefits related to medical services provided by a health care provider" and "receiving authorization to pay at least a portion of submitted charges associated with the explanation of benefits and the associated funds for payment" are constituent and inherent steps that have long been part of the conventional business practice of adjudicating and paying health care benefits.

---

[43] *Id*. col. 5:41–61.
[44] *Id*. col. 6:7–9.

The Claim 17 step of "funding a unique, single-use stored-value card account with an amount equal to the adjudicated benefit payment by one or more computers" does not provide an inventive concept for the reasons stated above.  The term "unique, single use, stored value card account" fails for the same reasons stated above for Claim 1.  The term "one or more computers" fails for the same reasons stated above for Claims 1 and Claim 7.  The Claim 17 term "merging the explanation of benefits with the stored-value card account number, the adjudicated benefit amount of payment, a card verification value code, and an expiration date in an electronic file" fails for the same reasons stated above for Claim 2.

The final independent claim, Claim 22, is directed to "a system for payment of adjudicated health care benefits to a health care provider".  However, as shown in Figure 1, the Claim 22 limitation of "an administration system operable to receive a benefit claim from the health care provider and to generate an explanation of benefits for the benefit claim along with an approved payment" is a constituent and inherent step that has long been part of the conventional business practice of adjudicating and remitting health care payments to health care providers with EOBs.  Also, the Claim 22 limitation of "a card processing system operable to fund a single-use stored-value card account with an amount equal to the approved payment by one or more computers" is inherent in any computerized payment system that adds funds to either a virtual payment card or a virtual payment card.[45]

Finally, just as the independent claims are invalid, so too are the dependent claims. Dependent claims 3–5, 8–11, 13–16, 18–21, and 23–26 also fail to provide an inventive concept to the respective ones on independent Claims 1, 2, 6, 7, 12, 17, and 22.  Each of the dependent claims contains limitations that are found in one or more independent claims, and therefore fail for the same reasons. Claim 3, for example, recites the routine use of a fax machine to transmit

---

[45] '904 Patent col. 6:43–44.

the image file. Claims 4, 8, 13, 18, and 23 recite the conventional and routine claim limitation of reconciling payments to ensure the health care provider has been paid. Claims 5, 11, 16, 21, and 26 recite that the payment card is chargeable only through a medical services terminal (e.g., a dedicated credit card swipe machine). Claims 9, 14, 19, and 24 recite that a computer-generated image of a physical payment card is included in the transmitted file. Claims 10, 15, 20, and 25 recite that the electronic transmission is performed by one of a laundry list of well-known protocols for transmitting data, including fax, SMTP, SMS, MMS, HTTP, HTTPS, and FTP.

Taken as whole, these claims merely take a well-known and routine business transaction (payment of an adjudicated claim and transmission of an EOB) and break it down into small, constituent steps, some of which are performed by a computer. As such, these claims are not patentable under § 101. The Court should therefore grant Defendants' motion to dismiss and invalidate the '904 Patent's claims.

**B.      StoneEagle Failed to Include Sufficient Allegations to Support a Claim of Indirect Infringement.**

Alternatively, the Court should grant Defendants' motion to dismiss because StoneEagle's allegations of contributory and induced infringement are too conclusory to state plausible indirect-infringement claims.[46]  Each issue is addressed in turn below.

> **1.      Without allegations showing that Defendants' products have no substantial non-infringing uses, StoneEagle cannot state a claim for contributory infringement.**

StoneEagle has failed to state a claim for contributory infringement because the complaint does not show that Defendants' products lack any non-infringing uses. Claims for contributory infringement require plaintiffs to show (not merely assert) that "a party sells or offers to sell, a material or apparatus for use in practicing a patented process, and that 'material

---

[46] *Id.* ¶ 44.

or apparatus' is material to practicing the invention, has no substantial non-infringing uses, and is known by the party 'to be especially made or especially adapted for use in an infringement of such patent.'" *In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d at 1337 (quoting 35 U.S.C. § 271(c)). "[A] substantial non-infringing use is any use that is not unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental." *Id.* (internal quotation marks omitted).

Here, there are *no* facts in StoneEagle's complaint that show that Defendants' products have no substantial non-infringing uses. In its complaint, StoneEagle alleges that "Defendants are providing to others a product made by the patented Medical Payment System and comprising a method of facilitating payment of health care benefits through electronically transmitting a stored-value card concurrently with an explanation of benefits—the same Medical Payment System process covered by the Patent."[47]   But conclusory assertions, such as these, that merely mimic the statutory language, cannot be taken as true for purposes of a Rule 12(b)(6) motion. *See Gonzales*, 577 F.3d at 603.

To state a contributory infringement claim, StoneEagle must instead *show*—with pleaded facts—that the services available from Defendants have no use other than in the specific combination of steps that comprise the methods in the issued claims of the patent. *See, e.g., In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d at 1338–39 (holding plaintiff failed to state a claim for contributory infringement where plaintiff failed to allege facts showing that defendants' products could "perform the infringing method and *only* the infringing method"). There are, however, no such allegations in StoneEagle's complaint. All that

---

[47] *Id.*

StoneEagle does is parrot the language of § 271.[48] Accordingly, the Court should dismiss StoneEagle's contributory infringement claim as implausible.

### 2.      StoneEagle fails to state a claim for induced infringement under *Limelight*.

Conclusory allegations that "Defendants replaced StoneEagle/VPay's functions using third parties including Comdata Network, Inc., Regions Bank, ECHO Health, Inc., HP Enterprise Services, and WEXBank,"[49] and are now "actively inducing or have induced other to infringe the Patent,"[50] are not sufficient to state a claim for induced infringement. Under 35 U.S.C. § 271(b), anyone who "actively induces infringement of a patent shall be liable as an infringer." Induced infringement claims are predicated on direct infringement. *See, e.g.*, *Limelight Networks*, 134 S. Ct. at 2117.

Here, although StoneEagle's patent lists twenty-six claims, the complaint does not limit StoneEagle's claims of infringement to any one claim. Moreover, all twenty-six claims are effectively methods claims.[51] *Bancorp Servs.*, 687 F.3d at 1277 (construing systems claims and methods claims as the same). Because "a method patent is not directly infringed—and the patentee's interest is thus not violated—unless a single actor can be held responsible for the performance of all steps of the patent," *Limelight Networks*, 134 S. Ct. at 2119, StoneEagle cannot state an induced infringement claim without first pleading plausible facts showing that Defendants perform each step of all twenty-six method claims (unless StoneEagle wants to narrow its claims). *Id*. This showing can be made by pleading plausible facts that show either that Defendants actually perform each step of each claim, or that Defendants directed or controlled others who performed each step of each method claim. *Id*.; *see also B-50.com, LLC v.*

---

[48] *Id.*
[49] *Id.* ¶ 31, at 10.
[50] Id. ¶ 44, at 13.
[51] '904 Patent col. 4–col. 6.

*InfoSync Servs., LLC*, No. 10-cv-1994, 2014 WL 4988287, at *4 (N.D. Tex. Oct. 7, 2014). Here, StoneEagle's complaint lacks any plausible facts sufficient to support either showing.

All that StoneEagle alleges is that "Defendants replaced StoneEagle/VPay's functions using third parties including Comdata Network, Inc., Regions Bank, ECHO Health, Inc., HP Enterprise Services, and WEXBank,"[52] and are now "actively inducing or have induced other to infringe the Patent."[53] There are no facts that would show (1) that Defendants performed each step of each claim, (2) that Defendants directed or controlled the "third parties" referred to in the allegations, or (3) that these third parties performed each step of each method claim. StoneEagle has therefore failed to state a claim for induced infringement.

## CONCLUSION

The Court should grant Defendants' motion to dismiss either because the '904 Patent is invalid under § 101 or because StoneEagle's complaint fails to plead a claim of indirect infringement. The '904 Patent is merely an abstract idea cloaked in purely functional steps and standard computer operations and is therefore outside the scope of § 101. That said, even if the patent is valid, StoneEagle's claims for indirect infringement (contributory and induced infringement) are deficient. Neither claim is supported by plausible facts. StoneEagle's patent claims should therefore be dismissed in whole or in part.

---

[52] *Id.* ¶ 31, at 10.
[53] Id. ¶ 44, at 13.

Date: _October 28, 2014_____                    Respectfully submitted,

                                                    /s/ *Joshua J. Bennett*_____
                                                    E. Leon Carter
                                                    Texas State Bar No. 03914300
                                                    lcarter@carterscholer.com
                                                    J. Robert Arnett II
                                                    State Bar No. 01332900
                                                    barnett@carterscholer.com
                                                    Sean T. Hamada
                                                    Texas State Bar No. 24014448
                                                    Email: shamada@carterscholer.com
                                                    Joshua J. Bennett
                                                    Texas State Bar No. 24059444
                                                    jbennett@carterscholer.com
                                                    CARTER SCHOLER ARNETT HAMADA
                                                    & MOCKLER, PLLC
                                                    8150 N. Central Expressway, Ste. 500
                                                    Dallas, Texas 75206
                                                    Tel.: 214-550-8188 | Fax: 214-550-8185

                                                    **ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I hereby certify that on October 28, 2014, all counsel of record were served with a copy of the foregoing response through the Court's electronic filing system.

                                                    /s/ *Joshua J. Bennett*_____
                                                    Joshua J. Bennett